UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
GREGORY HARRIS,                              :
                                             :
                              Plaintiff,     :
                                             :          **OPINION AND ORDER**
              -against-                       :          13-CV-1046 (DLI)
                                             :
CAROLYN W. COLVIN,                           :
Commissioner of Social Security,             :
                                             :
                              Defendant.     :
-------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On July 11, 2011, Plaintiff Gregory Harris ("Plaintiff") filed an application for Social

Security disability insurance benefits ("DIB") and supplemental security income ("SSI") under

the Social Security Act (the "Act"). (*See* Certified Administrative Record ("R."), Dkt. Entry No.

19 at 152-62.) On August 24, 2011, Plaintiff's applications were denied and he requested a

hearing. (R. 80-97.) On February 8, 2012, Plaintiff appeared with counsel and testified at a

hearing before Administrative Law Judge Patrick Kilgannon (the "ALJ"). (R. 39-75.) In a

decision dated April 4, 2012, the ALJ concluded that Plaintiff was not disabled within the

meaning of the Act. (R. 23.) On January 2, 2013, the ALJ's decision became the

Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.

(R. 1-5.)

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. § 405(g). (*See* Complaint ("Compl."), Dkt. Entry No. 1.) The Commissioner

moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, seeking affirmation of the Commissioner's decision. (*See* Mem. of Law in Supp. of

Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 17.) Plaintiff cross-moved for

judgment on the pleadings, seeking reversal of the Commissioner's decision regarding SSI benefits, or, alternatively, remand. (*See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem."), Dkt. Entry No. 14.) Plaintiff does not appeal the Commissioner's decision denying his application for DIB. (*Id.* at 1.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's motion for judgment on the pleadings is denied. The instant action is dismissed.

## BACKGROUND

### A.    Non-Medical and Self-Reported Evidence

Plaintiff was born on October 30, 1965, and has a high school education. (R. 51, 152.) From 2002 to 2009, Plaintiff was incarcerated resulting from a robbery conviction. (R. 50, 54.) Prior to his incarceration, he worked as a car washer, gate guard, and flagger. (R. 52, 55-56.)

### 1.    Disability and Function Reports

In an undated disability report, Plaintiff stated that he suffered from posttraumatic stress disorder ("PTSD"), mood disorder, and antisocial personality disorder. (R. 176.) He was first treated for severe depression and anxiety in 1994 after admitting himself to Kings County Hospital, where he spent seven days. (R. 182.) He also reported auditory hallucinations, which affected his focus and concentration. (*Id.*) He had nightmares, which were caused by physical abuse he suffered in prison, and he could only sleep for three hours a night, which led to constant exhaustion. (*Id.*) Additionally, he became anxious and agitated in crowded places. (*Id.*) He reported that he had stopped working because of these impairments. (R. 176.)

In a function report dated July 11, 2011, Plaintiff said that he groomed, medicated, and fed himself on a daily basis. (R. 201.) He reported that he tried to wash his laundry, but a friend frequently did it for him. (R. 203.) He also shopped for groceries once a month, but it took him

three hours to shop. (R. 204.) He had no hobbies or interests and no longer socialized with friends. (R. 205.) He described himself as antisocial. (R. 206.) He also claimed that his conditions affected his ability to walk, sit, see, complete tasks, concentrate, understand, follow instructions, and interact with others. (*Id.*) He could not walk more than six blocks without needing to rest for five minutes and could not focus for more than five minutes. (*Id.*)

## 2. Plaintiff's Testimony Before the ALJ

At the hearing, Plaintiff testified that, after his release from prison in 2009, he worked for a few weeks at a car wash, but was fired after an altercation with a coworker. (R. 52.) He has not worked since then. (*Id.*) As a condition of his parole, Plaintiff lived in a group home, which provided drug testing and meals. (R. 49.) He said that both his sponsor and doctor recommended that he focus on treatment instead of looking for work. (R. 52, 65-66.) He testified that he attended daily Alcoholics Anonymous ("AA") meetings with his sponsor, as well as meetings in a substance abuse program. (R. 61.) He has been drug free for about two years. (R. 63.)

Plaintiff visits a therapist weekly and a psychiatrist biweekly. (R. 59.) He takes Prozac and Seroquel for his conditions. (R. 63.) He was molested as a young man, which caused PTSD and nightmares; however, therapy and medication have led to fewer nightmares and better sleep. (R. 59, 64-65.) He has experienced difficulty with memory and concentration, but therapy has improved both. (R. 65.)

**B. Medical Evidence**

**1. Medical Evidence Prior to the Alleged Onset Date (September 12, 2002)**

There is no medical evidence in the record prior to Plaintiff's alleged onset date, September 12, 2002. Plaintiff reported that he received treatment for depression during his incarceration, but there are no records of such treatment. (R. 233.)

**2. Medical Evidence After the Alleged Onset Date (September 12, 2002)**

Plaintiff primarily sought treatment from CitiCare, Inc. ("CitiCare"). Elizabeth Dubois, N.P., first examined Plaintiff on September 27, 2010. (R. 306-08.) Nurse Dubois reported that he was in a "general good state of health." (R. 306.) His physical signs were normal. (*Id.*) His constitution was "pleasant, normal, alert and oriented." (*Id.*) He had no signs of acute distress. (R. 307.) Nurse Dubois referred him for a psychiatric examination. (R. 308.)

Dr. Jacques Jospitre, M.D., a psychiatrist at CitiCare, examined Plaintiff on September 29, 2010. (R. 295-97.) Plaintiff reported that his mood was fine, and that he slept about six hours per night. (R. 295.) He had a good appetite and energy, but he also had frequent flashbacks to his time in prison. (*Id.*) He reported a history of drug use. (*Id.*) Dr. Jospitre noted that Plaintiff was "disorganized" and "difficult to interview," and that he may have experienced a "dissociative episode" during the examination. (R. 295.) He was inappropriate at times and displayed paranoia when asked to sign a medical release. (*Id.*) Dr. Jospitre diagnosed Plaintiff with PTSD, psychosis not otherwise specified ("NOS"), and polysubstance dependence. (R. 296.) Subsequently, Nurse Dubois examined Plaintiff. (R. 302-05.) She noted that he was well developed, with no signs of acute distress. (R. 304.)

Tom Kearns, Ph.D., a licensed clinical social worker at CitiCare, examined Plaintiff on February 15, 2011. (R. 298.) He noted that Plaintiff was frustrated with his drug treatment and

wanted more opportunities to discuss his issues. (*Id.*) Dr. Kearns and Plaintiff met again on March 8, 2011. (R. 293.) Plaintiff told Dr. Kearns that a male cousin molested him when he was eleven years old and that he had suffered from trauma in prison. (*Id.*) He used drugs for twenty years. (*Id.*) Dr. Kearns noted that Plaintiff's affect was blunted and his mood was depressed; however, he had appropriate grooming, normal judgment, and good memory. (*Id.*)

Plaintiff met with Dr. Jospitre on March 15, 2011. (R. 299-301.) Dr. Jospitre reported that Plaintiff was brighter, calmer, and more stable than he was during his first visit. (R. 300.) He also was less anxious and in a better mood. (*Id.*) Dr. Jospitre examined Plaintiff again on March 22, 2011. (R. 289.) Plaintiff reported less anxiety and better sleep. (*Id.*) He was hopeful about his future. (*Id.*)

In a letter to CitiCare dated May 20, 2011, Juan Vega, a credentialed alcoholism and substance abuse counselor ("CASAC") at ACI Drug and Alcohol Treatment Center, wrote that Plaintiff was attending drug and alcohol counseling sessions Monday through Friday each week. (R. 262.) He also received mental health treatment once a month for depression. (*Id.*) Mr. Vega wrote that Plaintiff was "high functional," but that a lack of housing could impact his recovery and goals. (*Id.*) Plaintiff was scheduled to complete his treatment by August 2011 and intended to apply for a commercial driver's license. (*Id.*)

On May 24, 2011, Dr. Kearns reported that Plaintiff was succeeding at his job and feeling less stressed. (R. 288.) Plaintiff intended to participate in CASAC training in Fall 2011. (*Id.*) Nurse Dubois also examined him, indicating that he was pleasant, alert, and well oriented. (R. 292.)

Notably, on June 7, 2011, Dr. Kearns reported that Plaintiff was "moving in a . . . positive direction." (R. 286.) He was enjoying his new work at a car wash and interacting well with

others.  (*Id.*)  Dr. Kearns made similar remarks in a progress note dated June 21, 2011.  (R. 287.)  In a functional assessment completed at that appointment, Dr. Kearns diagnosed Plaintiff with PTSD, psychosis NOS, and polysubstance dependence.  (R. 264-65.)  He stated that Plaintiff struggled with flashbacks, anxiety, and anger issues.  (R 264.)  Dr. Kearns concluded that Plaintiff was temporarily unemployable, but was "on track to be employed."  (*Id.*)

On June 22, 2011, Plaintiff told Social Worker Venus Keye ("SW Keye") that he was "feeling down, depressed, or hopeless" for "several days."  (R. 234.)  He had little interest in doing things, trouble sleeping, and low energy.  (*Id.*)  He did not have any trouble concentrating.  (*Id.*)  He could wash clothes, watch TV, make beds, read, and socialize, as well as dress, bathe, and groom himself.  (R. 235.)  He fished, and played and watched basketball.  (*Id.*)  He also maintained contact with friends, prayed at his mosque, and attended Narcotics Anonymous ("NA") and AA meetings three times weekly.  (R. 235-36.)  SW Keye noted that Plaintiff's depression was mild.  (R. 234.)  She also noted that Plaintiff had appropriate appearance and hygiene.  (R. 236.)  He had no significant limitations on travel, and he interacted appropriately with others.  (*Id.*)  However, Plaintiff reported that difficulty interacting with others was a barrier to his employment.  (*Id.*)

The same day, Hun Han, M.D., examined Plaintiff.  (R. 242.)  Dr. Han found that Plaintiff's physical signs were normal.  (*Id.*)  He noted no pain or physical limitations with regard to sitting, walking or reaching.  (R. 243.)  Dr. Han referred Plaintiff to Robert London, Ph.D, a psychiatrist, for an evaluation.

On June 27, 2011, Plaintiff met with Dr. London, who diagnosed him with PTSD, mood disorder, antisocial personality disorder, and a history of substance abuse.  (R. 253.)  Dr. London noted that Plaintiff's manner was cooperative, his speech was normal, and his thought was

logical.  (R. 250.)  He had no suicidal thoughts, but had recurring recollections of traumas suffered as a child and during incarceration.  (*Id.*)  Dr. London opined that Plaintiff's chronic mental illnesses resulted in substantial limitations to his ability to work for at least twelve months.  (R. 253.)  Dr. Han's final report, dated June 28, 2011, incorporated Dr. London's opinion.  (R. 247.)

In a progress note dated July 5, 2011, Dr. Kearns indicated that Plaintiff was "moving towards [] more stable living" and "doing a very good job."  (R. 285.)  His work was good and he was making friends.  (*Id.*)

### 3. Medical Evidence After SSI Application Date (July 11, 2011)

E. Kamin, M.D., an agency psychological consultant, reviewed Plaintiff's medical files on August 22, 2011.  (R. 269-82.)  He indicated that Plaintiff's impairments were not severe.  (R. 269.)  He found that there were no limitations on Plaintiff's daily living, mild limitations on his social functioning, mild limitations on his concentration, persistence, and pace, and insufficient evidence of repeated periods of deterioration.  (R. 279.)

On September 9, 2011, Plaintiff began an intensive outpatient drug treatment program at the Dr. Martin Luther King, Jr. Health Center.  (R. 355.)

On September 20, 2011, Plaintiff told Dr. Kearns that he was feeling less "edgy" and was better able to control his impulses.  (R. 339.)  He also planned to attend CASAC training in November.  (*Id.*)  One week later, Dr. Kearns reported that Plaintiff was doing well.  (R. 338.)  His housing was "alright," and he was preparing to start job training.  (*Id.*)  On November 8, 2011, Dr. Kearns reported again that Plaintiff was doing well.  (R. 329.)  He was "getting his house together" and working at the car wash.  (*Id.*)

Jeffrey Day, A.R.N.P., completed a medical source statement on November 8, 2011. (R. 356-61.) In the statement, Nurse Day noted that he saw Plaintiff monthly for 45 minute-long visits. (R. 356.) Plaintiff was responding well to his medication and had a Global Assessment of Functioning ("GAF") rating of 55.[1] (R. 356.) However, Plaintiff exhibited signs and symptoms of anhedonia, emotional withdrawal, paranoid thinking, memory impairment, sleep disturbance, and recurrent panic attacks, among others. (R. 361.) His mental impairments placed marked limitations on his daily living activities, social functioning, concentration, persistence, and pace. (R. 358.) He had three episodes of decompensation within a twelve-month period, each lasting at least two weeks.[2] (Id.) Social phobia, depression, anxiety, and frustration hampered his ability to meet competitive standards. (Id.) He was unable to meet competitive standards in areas such as remembering short and simple instructions, sustaining ordinary routines without special supervision, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (R. 360.) Nurse Day estimated that Plaintiff's impairments would cause him to miss more than four days of work per month on average. (R. 359.) He expected the impairments to last at least twelve months. (Id.)

After Plaintiff's hearing, Herb Meadow, M.D., performed a consultative psychiatric evaluation. (R. 362-65.) Dr. Meadow indicated that Plaintiff was coherent and exhibited no signs of hallucination, delusion, or paranoia. (R. 363.) He was fluent and clear. (Id.) "[L]imited intellectual functioning" impaired his attention and concentration. (R. 364.) During the evaluation, Plaintiff could count and add single digits using his fingers. (Id.) His recent and

[1]    "GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F. 2d 402, 405 n.1 (2d Cir. 2010). A GAF of 51 to 60 indicates "moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers)." *Id*. at 406 n.3 (internal citations omitted).

[2]    There are no medical records regarding inpatient hospitalizations or emergency room visits substantiating these findings. Indeed, Plaintiff denied any prior hospitalizations (R. 362) and described a treatment plan that was conservative, consisting of weekly therapy sessions and biweekly psychiatry sessions (R. 59-63).

remote memory skills were intact. (*Id.*) Dr. Meadow noted that he maintained his personal hygiene and did household chores. (*Id.*) He socialized with friends and family, went to NA meetings, and watched TV. (*Id.*) Dr. Meadow concluded that Plaintiff could "follow and understand simple directions and perform simple tasks independently." (*Id.*) He may have difficulty with complex tasks and learning new tasks. (*Id.*) He could make appropriate decisions, but may have trouble relating to others. (*Id.*) Dr. Meadow diagnosed Plaintiff with dysthymic disorder, rule out bipolar disorder, rule out paranoid schizophrenia, panic disorder without agoraphobia, PTSD, mathematics disorder, and cannabis, PCP, and alcohol abuse/dependence in remission. (R. 364-65.) Dr. Meadow opined that Plaintiff's limitations were not "significant enough to interfere with [his] ability to function on a daily basis in a limited manner." (R. 364.)

### 3. Evidence Submitted after the ALJ's Decision

After his hearing, Plaintiff submitted three questionnaires co-signed by Nurse Day and James McKnight, M.D. (R. 366-71.) Notably, the questionnaires applied to the period of September 27, 2010 through May 1, 2012. (R. 368, 369, 371.) The depression questionnaire indicated that Plaintiff suffered from depression characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, suicidal thoughts, and hallucinations, delusions, or paranoid thinking. (R. 366-67.) Plaintiff showed signs of marked restrictions on daily living activities, difficulty maintaining social functioning, and repeated episodes of deterioration or decompensation in work settings. (R. 367.) The questionnaire indicated "even a minimal increase in mental demands or change in the environment would be predicted to cause

[Plaintiff] to decompensate." (*Id.*) Plaintiff displayed a continued need for a highly supportive living arrangement. (R. 368.)

The PTSD questionnaire indicated that Plaintiff had marked restrictions or difficulty with daily living activities, social functioning, and concentration. (R. 369.) Repeated episodes of deterioration or decompensation caused him to withdraw from work like environments or exhibit exacerbated signs and symptoms. (*Id.*)

Finally, the mental residual function capacity questionnaire indicated severe impairments or restrictions relating to social functioning, daily activities, personal habits, and interests. (R. 370.) Additionally, his ability to understand, carry out, and remember instructions; respond to supervision, coworkers, and pressures; and perform simple, complex, repetitive, or varied tasks was severely limited. (R. 370-71.) These limitations were expected to last twelve months or longer. (R. 371.)

## C.      Vocational Expert ("VE") Testimony

At the hearing, VE David Vandergoot testified. (R. 66-73.) After hearing Plaintiff's testimony, the VE classified Plaintiff's past occupations, relying on the Dictionary of Occupational Titles (DOT) and data from the Department of Labor, Bureau of Labor Statistics. (R. 73.) From the late 1980s to the mid 1990s, Plaintiff worked as a car washer, which was an unskilled, medium exertion position. (R. 67.) In the late 1990s, he worked as a security guard, which was a semiskilled, light exertion position. (*Id.*) Most recently, he worked as a flagger, which was an unskilled, light exertion position. (R. 69.)

Then, the ALJ presented the VE with a series of six hypotheticals, each of which assumed an individual of Plaintiff's age, education, and work experience. (R. 69.) In each hypothetical, the ALJ added nonexertional limitations to the individual's work. (R. 70.) In the

first hypothetical, the individual's work was limited to simple, routine, and repetitive tasks. (R. 70.) The VE testified that the individual could perform at least the car washer and flagger positions. (*Id.*) In the second hypothetical, the individual's work was the same as the first, but involved a low-stress position with only occasional decision-making and occasional changes in work setting. (*Id.*) The VE indicated that the individual could only work as a car washer. (*Id.*) In the third hypothetical, the individual had the same restrictions as above, but only occasional interaction with the public. (*Id.*) The VE indicated that the individual could work as a car washer. (*Id.*)

The fourth hypothetical involved the same conditions as above, except no interaction with the public. (*Id.*) The VE indicated that the individual could work as a car washer. (R. 71.) Similarly, the fifth hypothetical involved the same conditions as above, but also included only occasional interaction with coworkers. (*Id.*) The VE testified that the individual could not perform any of these positions. (*Id.*) Finally, the sixth hypothetical involved an individual who could not have any interaction with coworkers. (R. 72.) The VE testified that no such positions existed. (*Id.*)

Assuming the limitations of the fifth hypothetical, the VE testified that the individual could work as a photocopy machine operator (an unskilled position with 79,000 jobs nationally), a laundry worker (an unskilled position with 175,000 jobs nationally), or a clerical checker (an unskilled position with 100,000 jobs nationally).[3] (R. 71-72.) The VE also testified that none of these positions or the positions posed in the hypotheticals would be available to an individual who would miss four days or more per month of work because of impairments or treatment obligations. (R. 72-73.)

---

[3]     The VE estimated that there were 5,700, 1,900, and 1,500 jobs available, respectively, in the greater New York area. (R. 71-72.)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations."  *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004).  A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record."  *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314

(E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (quotations omitted).

**B.    Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. § 1382c(a)(1)(A). Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable . . . mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 20 C.F.R. § 416.912(a); *see also Perez v. Charter*, 77 F. 3d 41, 46 (2d Cir. 1996).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 416.920. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education and work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. § 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. § 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [his or her physical or mental] limitations." 20 C.F.R. § 416.945(a)(1). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. § 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Perez*, 77 F. 3d at 46 (citing *Carroll v. Sec'y of Health & Human Services*, 704 F. 2d 638, 642 (2d Cir. 1983)).

## C.     The ALJ's Decision

On April 4, 2012, the ALJ issued a decision denying Plaintiff's claims. (R. 22-34.) Following the five-step analysis, the ALJ concluded that the Plaintiff was not disabled, because he could adjust to other work in the national economy. (R. 34.) First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 12, 2002. (R. 25.) Second, the ALJ found the following severe impairments: depression, PTSD, and polysubstance dependence in remission. (*Id.*) The ALJ concluded that "psychosis," a diagnosis mentioned in the record, was not a presently determinable disorder. (*Id.*) Third, the ALJ concluded that Plaintiff's impairments, in combination or individually, did not meet or equal the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

Fourth, the ALJ found that Plaintiff had the RFC to perform a full range of work under 20 CFR § 416.967 with some nonexertional limitations. (R. 27.) Plaintiff could engage in low stress work with "simple, routine, and repetitive" tasks. (*Id.*) His decision-making should be

limited and his work setting should only occasionally change. (*Id.*) He should not have any interaction with the public, but could sometimes interact with coworkers. (*Id.*) The ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (R. 28.) Upon making these findings, the ALJ concluded that Plaintiff could not perform past relevant work as a car washer, gate guard or flagger. (R. 33.)

Fifth, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (R. 33.) Plaintiff could work as a photocopy machine operator, a laundry worker, or a clerical checker. (R. 33-34.) As such, the ALJ concluded that Plaintiff was not disabled under the Act. (R. 34.)

**D.    Application**

The Commissioner moves for judgment on the pleadings. (*See generally* Def. Mem.) The Commissioner argues that the ALJ applied the correct legal standards to decide that the Plaintiff was not disabled, because he could perform other work in the national economy. (*Id.* at 14; Reply Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Reply Mem.") at 2-9, Dkt. Entry No. 18.) Moreover, the Commissioner contends that the ALJ's legal findings are supported by substantial evidence. (Def. Mem. at 16.) Plaintiff cross-moves for judgment on the pleadings. (*See generally* Pl. Mem.) Plaintiff argues that the ALJ erred by: (1) finding that Plaintiff did not have a listing-level impairment; (2) applying the treating physician rule to discredit Nurse Day and Dr. McKnight; (3) discrediting Plaintiff's testimony as to his symptoms; and (4) omitting the full extent of Plaintiff's limitations in the hypotheticals presented to the VE. (*See id.*)

Upon review of the record, the Court finds that the ALJ applied the correct legal standards and his decision is supported by substantial evidence. Plaintiff's arguments to the contrary are meritless.

### 1.     Plaintiff Does Not Have a Listing-Level Impairment

Plaintiff argues that his impairments are "listing-level," contending that he satisfies the requirements for affective disorders (20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(A)-(C)) and anxiety related disorders (§§ 12.06(A)(2), (B)). (Pl. Mem. at 11.) Section 12.04(A) impairments include depressive syndrome, sleep disturbance, and hallucinations. Section 12.06(A) impairments include anxiety, irrational fear, and irrational fear of a specific situation. Plaintiff's satisfaction of the requirements of sections 12.04(A) and 12.06(A) is not in dispute. (*See* R. 25; Def. Reply Mem. at 2.)

However, Plaintiff is unable to satisfy the section 12.04(B) and 12.06(B) requirements for these disorders. Under these sections, a claimant must show that his or her section A impairments result in *two* of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B) (emphasis added). A "marked limitation" is one that "interfere[s] seriously with [one's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). "Marked" means "more than moderate but less than extreme." *Id.*

The ALJ concluded that Plaintiff's impairments, considered individually or in combination, did not satisfy sections 12.04(B) or 12.06(B), because the impairments did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of

decompensation." (R. 25-27.) Substantial evidence supports the ALJ's conclusion.

Regarding daily living activities, the ALJ found only a mild restriction, which is supported by substantial evidence. (R. 26.) Plaintiff's admissions indicate that he grooms, medicates, feeds, and shops for himself. (R. 60, 201, 204.) Plaintiff told SW Keye that he launders his clothing and makes his bed. (R. 235.) He frequently attends substance abuse meetings, and psychiatric and therapeutic sessions. (R. 59, 61, 262.) Dr. Meadow noted that Plaintiff maintained his personal hygiene and performed household chores. (R. 364.)

Similarly, substantial evidence supports the ALJ's finding of moderate difficulties in social functioning. (R. 26.) For example, Dr. Kearns reported that Plaintiff was interacting well with others and making friends. (R. 285-86.) Plaintiff told SW Keye that he fished, watched and played basketball, socialized with friends, prayed at his mosque, and attended AA and NA meetings. (R. 235-36.)

Substantial evidence also supports the ALJ's finding of moderate difficulties with concentration, persistence or pace. (R. 26.) On June 22, 2011, Plaintiff told SW Keye that he did not have any trouble concentrating. (R. 234.) Similarly, at the hearing, Plaintiff testified that therapy and medication had improved his concentration. (R. 65.) Moreover, as the ALJ noted in his decision, Dr. Meadow found that Plaintiff's concentration was impaired by "limited intellectual functioning" and not his psychological conditions. (R. 26, 364.)

Although Nurse Day reported that Plaintiff had three episodes of decompensation within a 12-month period (R. 358), there is no other evidence in the record substantiating these findings. Plaintiff's testimony indicates that he treated conservatively (R. 59-63) and he reported no prior hospitalizations related to his psychiatric impairments (R. 362). Moreover, as set forth more fully below, the ALJ did not err in assigning minimal weight to Nurse Day's opinion. As such,

the ALJ's finding of no repeated episodes of decompensation is supported by substantial evidence. (R. 26.) Plaintiff, therefore, does not satisfy sections 12.04(B) or 12.06(B).

Nor does Plaintiff satisfy section 12.04(C), which requires a claimant to show:

> a [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended duration; or
> >
> > 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). As discussed above, there is no evidence of hospitalizations or emergency room treatment, such that requirement 1 would be satisfied. Similarly, the only evidence to support requirements 2 and 3 are questionnaires completed by Nurse Day and Dr. Mc Knight, to which the Commissioner correctly assigned minimal weight. (R. 366-71.) As such, the ALJ did not err in finding that Plaintiff's impairments, individually or in combination, did not meet or equal a listed impairment.

## 2. The ALJ Properly Applied the Treating Physician Rule

Plaintiff argues that the ALJ misapplied the treating physician rule by ignoring Dr. McKnight's opinions and "substitut[ing] his own opinion for competent medical evidence from acceptable medical sources." (Pl. Mem. at 16.) Plaintiff's argument is without merit.

An ALJ must give controlling weight to the opinion of a treating physician with respect to "the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F. 3d 126, 134 (2d Cir. 2000). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F. 2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record." *Burgess v. Astrue*, 537 F. 3d 117, 128 (2d Cir. 2008) (quotation marks and alteration omitted). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 416.927(c)(2)-(6). The ALJ must clearly state his or her reasons for not giving controlling weight to a treating physician's opinion. *See Halloran v. Barnhart*, 362 F. 3d 28, 31-32 (2d Cir. 2004).

### a. Dr. McKnight's and Nurse Day's Opinions

Plaintiff contends that Dr. McKnight's opinions must be given controlling weight under the treating physician rule, because the opinions are uncontradicted "by any examining source." (Pl. Mem. at 17.)  Plaintiff's contention is unfounded.  As a preliminary matter, Dr. McKnight's opinion was not available until after the ALJ issued his decision.  Dr. McKnight co-signed three questionnaires with Nurse Day, and these questionnaires were submitted after the ALJ issued his decision.  (R. 366-71.)  Thus, contrary to Plaintiff's contention, the ALJ did not "ignore" Dr. McKnight's opinion.  The Court construes Plaintiff's submissions as challenging the Appeals Council's decision declining to review the ALJ's decision, which was rendered upon consideration of the three questionnaires co-signed by Dr. McKnight and Nurse Day.  In its decision, the Appeals Council noted that the questionnaires did "not provide a basis for changing [the ALJ's] decision."  (R. 2.)  This Court agrees.

Remand is justified when there is new and material evidence for which a claimant had good cause not to submit to the ALJ.  *See* 42 U.S.C. § 405(g).  New evidence is "material" when it is "relevant to [a] claimant's condition during the time period for which benefits were denied," "probative," and "would have influenced the [Commissioner] to decide claimant's application differently."  *Tirado v. Bowen*, 842 F. 2d 595, 597 (2d Cir. 1988); *see also Lisa v. Sec'y of Dept. of Health & Human Servs.*, 940 F. 2d 40, 44-45 (2d Cir. 1991) (stating that new evidence is material when it would "shed[] considerable new light on the seriousness of [a claimant's] condition" (internal citations omitted) (alteration in original)).

The co-signed questionnaires are not material because the questionnaires reflect, at least in part, the opinion of Nurse Day, to which the ALJ correctly accorded minimal weight.  Notably, the co-signed questionnaires track the language of a November 21, 2011 medical source

statement prepared by Nurse Day that was submitted to the ALJ in advance of his decision. (*Compare* R. 356-61, *with* R. 366-71.) Both the co-signed questionnaires and Nurse Day's prior medical source statement indicate marked or severe limitations of Plaintiff's daily living activities, social functioning, and concentration, persistence, and pace, as well as repeated episodes of decompensation. (*Id.*) Due to the significant overlap between the co-signed questionnaires and Nurse Day's medical source statement, it is unlikely that the ALJ would have reached a different decision had the co-signed questionnaires been presented to him. *See Fernandez v. Apfel*, 1999 WL 1129056, at *3-4 (E.D.N.Y. Oct. 4, 1999) (finding that new evidence did not undercut the ALJ's decision when it was "cumulative" of other evidence in the record).

The ALJ assigned minimal weight to Nurse Day's opinions on the grounds that his opinions were not substantially supported by his findings, nor were they consistent with the record as a whole. (R. 32.) Substantial evidence in the record supports the ALJ's determination. First, some of the opinions of Nurse Day, contained in the November 21, 2011 medical source statement, are contradicted by Nurse Day's own objective findings. For example, Nurse Day opined that Plaintiff's impairments placed marked limitations on his daily living activities, social functioning, concentration, persistence, and pace. (R. 358.) Yet, he also noted that Plaintiff was responding well to his medication and had a GAF rating of 55, which indicates only moderate difficulty in social functioning. (*See* R. 356.)

Second, Nurse Day's opinions are inconsistent with other medical evidence in the record. Dr. Meadow's examination, conducted after the hearing, did not indicate any marked limitations caused by Plaintiff's impairments. (R. 362-65.) Dr. Kearns described Plaintiff as depressed, but appropriately groomed and with normal judgment. (R. 293.) Subsequently, he indicated that

Plaintiff was "on track to be employed." (R. 264.) Dr. Jospitre reported that Plaintiff was stabilizing and was hopeful about his future. (R. 299-301.) Under these circumstances, the ALJ was not required to give controlling weight to the opinions of Nurse Day and Dr. McKnight. *See Veino*, 312 F. 3d at 588 (affirming the ALJ's decision to give little weight to the treating physician's opinion as that opinion was "contrary to the findings of the consultative examination" and not supported by "objective evidence" and it "was within the province of the ALJ" to resolve conflicting medical opinions).

Third, Plaintiff's own statements indicate that he is able to handle basic daily living activities and that his concentration had improved. (R. 60, 65, 201-04.) Indeed, the record is replete with references to Plaintiff's socializing and interacting well with others. (*See, e.g.*, R. 235-36, 286, 364.) Finally, as the ALJ noted in his opinion, Nurse Day was neither a physician nor a specialist, whereas Dr. Meadow specialized in psychiatry. (R. 32.)

The same analysis applies to the co-signed questionnaires. The record substantially contradicts the statements contained in the questionnaires. Moreover, the questionnaires do not reveal new dimensions to Plaintiff's conditions, nor do they strongly suggest that Plaintiff's conditions were worse than the ALJ thought. Hence, the Appeals Council correctly declined to review the ALJ's decision.

### b. Other Treating Physician Opinions

The ALJ properly assessed the other opinions in the record. The ALJ properly accorded "minimal weight" to Dr. Han. (R. 31.) Dr. Han, based on Dr. London's evaluation, found that Plaintiff had substantial functional limitations on his employment due to his impairments, which would last at least twelve months. (R. 247.) The ALJ correctly explained that Dr. Han's evaluation, made in the context of Plaintiff's public assistance claim, represented another

governmental agency's determination about Plaintiff's disability status (R. 31), which was non-binding on the ALJ. *See* 20 C.F.R. § 416.904 (explaining that an ALJ is not bound by the decision of any nongovernmental agency or other governmental agency concerning a claimant's disability status); *see also Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994) (holding that the ALJ did not err in disregarding the treating physicians' disability determinations as they arose in the context of a workers' compensation claim). Thus, the ALJ was not bound by their determinations as to Plaintiff's disability status. Nevertheless, the ALJ considered them, *see Cutler v. Weinberger*, 516 F. 2d 1282, 1286 (2d Cir. 1975) (stating that determinations by other governmental agencies, while not binding, should be considered), concluding that their final report was not supported "by the more benign objective findings" in other medical records or by Plaintiff's "statement to [them] about having friends, attending religious services, and not being 'interested' in work." (R. 31.) Thus, in assigning "minimal weight" to their final report, the ALJ applied the correct standard and his decision is supported by substantial evidence.

The ALJ also properly accorded "minimal weight" to Dr. Kamin. (R. 32.) On August 22, 2011, Dr. Kamin conducted a psychiatric review of Plaintiff's file, concluding that Plaintiff did not have any severe medical impairments. (R. 269.) The ALJ assigned "minimal weight" to this opinion because by the time the ALJ issued his decision, nearly eighteen months later, Dr. Kamin's findings were "no longer supported . . . by the substantial evidence of record." (*Id.*) Numerous reports indicated that Plaintiff suffered from some form of substance addiction, depression or PTSD, and psychosis or mood disorder. (R. 250-53, 265, 295-97.)

The ALJ assigned the "greatest weight" to Dr. Meadow, explaining that his opinions were supported by his objective findings made in connection with his examination and by Plaintiff's treatment record with CitiCare. (R. 32.) The ALJ further explained that Dr.

Meadow's opinions were not contradicted by substantial evidence and that Dr. Meadow specialized in psychiatry. (R. 32.) Under these circumstances, the ALJ did not err in assigning greater weight to the consultative examiner than the treating physician. *See* 20 C.F.R. § 416.927(c)(4); *see also Veino*, 312 F. 3d at 588 (affirming ALJ's decision to assign greater weight to the consultative examiner instead of the treating physician as the consultative examiner's opinion was supported by objective findings and did not contradict other medical evidence in the record).

Although the ALJ did not explicitly say what weight, if any, he gave the opinions of Dr. Kearns and Dr. Jospitre, the ALJ's omission was harmless error. The Second Circuit has explained that "[w]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration." *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010) (declining to remand even though the ALJ failed to satisfy the treating physician rule as the medical record that the ALJ overlooked would not have altered the ALJ's disability determination (quoting *Johnson v. Bowen*, 817 F. 2d 983, 986 (2d Cir. 1987))); *see also Halloran*, 362 F. 3d at 32-33 (declining to remand even when the ALJ failed to provide "good reasons" for the weight given to a treating physician's opinion). This is not a case in which the ALJ overlooked opinions more favorable to Plaintiff. *See Snell v. Apfel*, 177 F. 3d 128, 134 (2d Cir. 1999) (remanding when Appeals Council failed to consider a treating physician's report that was more favorable to Plaintiff than reports considered by the Council). Dr. Kearns' and Dr. Jospitre's opinions tend to substantiate Dr. Meadow's evaluation, which was given the most weight. (*See, e.g.*, R. 285, 288, 295-97, 299-301). The ALJ's determination would not have been different had he explicitly outlined the weight assigned to these opinions. Therefore, the ALJ's oversight does not merit remand.

### 3. The ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff contends that there is no basis in the record for discrediting his testimony. (Pl. Mem. at 20.) Once again, Plaintiff's contention is without merit. The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *See Diaz v. Bowen*, 664 F. Supp. 725, 730 (S.D.N.Y. 1987) (citing *Marcus v. Califano*, 615 F. 2d 23, 27-28 (2d Cir. 1979)). However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "not required to accept the claimant's subjective complaints without question." *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (quoting *Genier v. Astrue*, 606 F. 3d 46, 49 (2d Cir. 2010)). In determining Plaintiff's credibility, the ALJ first must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. 20 C.F.R. § 416.929(b); S.S.R. 96-7p. Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. 20 C.F.R. § 416.929(c).

When the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 416.929(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, [he or she] must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010). When the ALJ neglects to discuss at length her credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his or her decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven).

In the instant case, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they" are inconsistent with the ALJ's RFC assessment. (R. 28.) The ALJ noted that the objective evidence indicated "some mental status abnormalities" and the need for "some work-related restrictions," but that the evidence did not show that the Plaintiff would be unable to perform all types of work. (R. 30.) Substantial evidence supports this finding. Aside from Nurse Day's source report (R. 365-61), most of the evidence points to mild restrictions. For example, progress notes from Dr. Kearns of CitiCare indicate improved social functioning. (*See, e.g.*, 285-88, 329, 338-39.) Similarly, Dr. Meadow found no severe limitations on Plaintiff's daily functioning. (R. 362-65.)

Pursuant to 20 C.F.R. § 416.929(c)(3)(i)-(vii), the ALJ thoroughly examined Plaintiff's subjective allegations, addressing each relevant point of the analysis. The ALJ noted that

Plaintiff's statements in their entirety showed Plaintiff can "manage his household chores," "maintain[] adequate social activities," "travel on public transportation," and balance a busy schedule of drug treatment programs. (R. 31.) The ALJ noted that Plaintiff frequently described his symptoms as mild to his physicians and psychiatrists. (*Id.*) Additionally, the ALJ noted that Plaintiff's medications were not "unusual" and that he responded well to them. (*Id.*) The ALJ also considered Plaintiff's inconsistent testimony about his work history, which "tend[ed] to contradict [his] allegations of isolating and not wanting to be around other people." (*Id.*) For example, Plaintiff testified that he worked at the car wash for only a few weeks after his release from prison. (R. 52.) Yet, Plaintiff first told Dr. Kearns that he was working at the car wash on June 7, 2011 (R. 286) and discussed the job repeatedly until November 8, 2011. (R. 329.) Thus, the ALJ did not err in discrediting Plaintiff.

### 4. The ALJ Did Not Err in His Presentation of Hypotheticals

Plaintiff contends that the ALJ erred by not including all of Plaintiff's limitations in the hypotheticals presented to the VE. (Pl. Mem. at 22.) Plaintiff's contention again is meritless.

If an ALJ cannot determine whether a claimant is disabled within the first three steps of the sequential analysis set forth in 20 C.F.R. § 416.920, then the ALJ considers the claimant's vocational background in conjunction with his or her RFC. 20 C.F.R. § 416.960(a). The claimant's vocational background includes his or her age, education, and work experience. *See* 20 C.F.R 416.920(g)(1); *Parker v. Harris*, 626 F. 2d 225, 231 (2d Cir. 1980). In this analysis, the ALJ may rely on testimony from a VE to determine whether the claimant can perform past relevant work or adjust to other work in the national economy. *See* 20 C.F.R. §§ 416.960(b)(2); 416.966(e). Additionally, the ALJ may present the VE with hypotheticals to evaluate whether the claimant can meet the demands of past work. 20 C.F.R. § 416.690(b)(2). The hypotheticals

must be based on substantial evidence and reflect the claimant's limitations and capabilities. *See Dumas v. Schweiker*, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); *Aubeuf v. Schweiker*, 659 F. 2d 107, 114 (2d Cir. 1981).

Turning to the instant action, the ALJ based the hypotheticals on substantial medical evidence, which accurately reflected Plaintiff's limitations and capabilities. In each hypothetical, the ALJ asked the VE to assume an individual of Plaintiff's age, education, and work experience. (R. 69.) Additionally, the ALJ asked the VE to consider various non-exertional limitations that reflected Plaintiff's RFC. (R. 70-72.) In the fifth hypothetical for example, the ALJ asked the VE to assume an individual whose work should be simple, routine, and repetitive, low stress with only occasional decision making and occasional changes in work setting, no interaction with the public, and occasional interaction with coworkers. (R. 70-71.) As discussed above, Plaintiff's statements and testimony as to his symptoms indicate that he becomes agitated and anxious in crowded places, has trouble concentrating and following instructions, and does not interact well with others. (R. 176, 206.) Medical evidence supports these reported limitations. (*See, e.g.*, R. 234-36, 286, 362-65.)

Plaintiff argues that the ALJ should have presented the VE with a slew of additional nonexertional limitations, which, in short, reflect marked difficulties in maintaining concentration, persistence, and pace, marked difficulties in social functioning, marked limitations on daily living activities, and repeated episodes of decompensation.[4] (*See* Pl. Mem. at 22.) Besides being entirely conclusory, Plaintiff's argument urges this Court to consider factors the

---

[4] Plaintiff argues that the ALJ erred in step five of the sequential analysis by concluding that Plaintiff could perform other work in the national economy despite attending substance abuse treatment five days a week from 9:00 a.m. to 3:00 p.m. (Pl. Mem. at 23.) The Commissioner rightly points out that the record does not support Plaintiff's statement about his treatment schedule. (Def. Reply Mem. at 9.) Plaintiff's drug treatment with ACI was scheduled to end in August 2011 (R. 262), and Plaintiff's testimony only mentions daily meetings and treatment. (R. 61.) Nevertheless, the ALJ considered Plaintiff's drug treatment when he concluded that Plaintiff could balance a busy schedule. (R. 31.)

ALJ was not required to examine.  Again, the hypotheticals presented to the ALJ must reflect the claimant's RFC, as supported by substantial evidence.  *See Mancuso v. Astrue*, 361 F. App'x 176, 179 (2d Cir. 2010) (affirming ALJ's finding that plaintiff could perform light duty work available in the national and local economies, even though the ALJ declined to consider the psychiatry related restrictions suggested by plaintiff as those restrictions were not supported by substantial evidence).  The hypotheticals did so.  Thus, the ALJ did not err in the hypotheticals presented to the vocational expert.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted.  Plaintiff's cross-motion for judgment on the pleadings is denied.  The appeal is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
        September 5, 2014

_____/s/_____
DORA L. IRIZARRY
United States District Judge
